**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DOMINIQUE J. FUDGE,

          Petitioner,

v.                              Case No. 3:23-cv-1112-TJC-MCR

SECRETARY, DEPARTMENT
OF CORRECTIONS,

          Respondent.

_____

**ORDER**

### I.    Status

Petitioner Dominique J. Fudge, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus. Doc. 1. Petitioner challenges a state court (Duval County, Florida) judgment of conviction for robbery with a firearm. He is serving a fifty-year sentence. Respondent filed a Response with exhibits. Docs. 13, 14.[1] Petitioner filed a Reply. Doc. 15. This case is ripe for review.[2]

---

[1] The Court will cite exhibits by document and page number as assigned by the Court's electronic case management system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's

## II.   Governing Legal Principles

### A. Standard Under § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), abrogation in part on other grounds recognized by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. Harrington v. Richter, 562 U.S. 86,

---

factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

2

100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 584 U.S. 122, 125-26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes

3

federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified) (emphasis in original).

## B. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable,

4

professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v.

5

Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105).

## III.   Factual Background and Procedural History

This case arises from an armed robbery of a delivery driver in Jacksonville, Florida. On the morning of June 20, 2017, Petitioner invited his friend Marlon Pinder to meet him at Dajour Wilson's house. Doc. 14-6 at 274. Pinder arrived at the house with a BB gun that resembled a "real gun." Id. at 277, 370. The three men "talk[ed]" and shot the BB gun at "[l]izards and a fence." Id. at 278. They eventually decided to go to a nearby abandoned house. Id. at 280-81. Before leaving, Petitioner and Wilson each retrieved a handgun. Id. at 279. Pinder took his BB gun with him. Id. at 281.

Soon after arriving at the abandoned house, the three men ordered Chinese food. Id. at 283. Petitioner left the house while Pinder and Wilson waited inside for the delivery. Id. According to Pinder, Wilson said he planned to "rob the Chinese delivery guy" and needed Pinder to "open the door." Id. at 284. Pinder agreed to help. Id. When the delivery driver arrived, Pinder opened

6

the door, and Wilson pointed a gun at him. Id. at 236-27. Both culprits had "shirts or rags pulled up over their faces." Id. at 236. They told the driver to "come inside." Id. at 237. He offered them the food they had ordered; they said, "No, that's not going to do, get inside." Id. at 238.

While this exchange took place, the driver's dashcam captured Petitioner walking up to the driver "with a sock over his face and a gun in his hand." Id. at 634. Petitioner pointed the gun at the driver's back and pulled the trigger, but the gun misfired. Id. at 185. He racked the slide and tried to shoot one more time, but the gun misfired again. Id. The driver "threw the food" at Pinder and Wilson, turned around, and began to run away. Id. at 239. After turning a "corner," the driver—who had a concealed carry permit—"spun around" and "opened fire" on Pinder and Wilson. Id. at 229, 239. Both men suffered nonfatal gunshot wounds; Wilson returned fire but did not hit the driver. Id. at 294-95, 404, 510-11.

Petitioner and Wilson fled, but Pinder was apprehended at the scene. Id. at 293-94. All three were ultimately charged with robbery with a firearm. Id. at 173, 321-22; Doc. 14-1. Petitioner and Pinder spoke to each other while detained at the county jail. Doc. 14-6 at 333. Petitioner told Pinder that he (Petitioner) "was in on" the robbery, that he "needed a third person," and that Pinder "was that third person." Id. Petitioner also said that "he and Wilson had planned" the robbery. Id.

7

Pinder pleaded guilty and testified for the State at Petitioner and Wilson's joint trial. Id. at 338-39. Because of a potential Bruton[3] issue, the court empaneled two juries, one for Petitioner and one for Wilson. Id. at 180. Petitioner's jury was removed from the courtroom when the State presented Wilson's out-of-court statements against Petitioner. Id. at 543-49. Additionally, each jury heard separate closing arguments. Id. at 483-84. Both Petitioner and Wilson were found guilty as charged, and each received a sentence of fifty years' imprisonment. Id. at 774, 783; see also Doc. 14-10 at 20-21.

The First District Court of Appeal (First DCA) affirmed Petitioner's conviction without a written opinion. Doc. 14-16. Petitioner then moved for postconviction relief under Florida Rule of Criminal Procedure 3.850, arguing that trial counsel was ineffective in several respects. Doc. 16-24. The postconviction court denied relief, and the First DCA affirmed in an unexplained decision. Id. at 368-79; Doc. 14-27. Petitioner also unsuccessfully sought postconviction relief under Rule 3.800(a), claiming that his fifty-year sentence was illegal. Doc. 14-33; Doc. 14-37. This federal habeas petition followed. Doc. 1.

---

[3] Bruton v. United States, 391 U.S. 123 (1968). The Court discusses the Bruton issue in more detail below.

8

### IV.    Analysis

**A. Ground One—Failure to Present "Keep Separate Order"**

Petitioner argues that trial counsel was ineffective for failing to inform the jury that he and co-defendant Pinder were subject to a "keep separate order" while in the county jail. Doc. 1 at 5. Pinder testified that he spoke to Petitioner a "couple of weeks" after arriving at the jail. Doc. 14-6 at 333, 338. During the conversation, Petitioner said that he (Petitioner) "was in on" the robbery, that he "needed a third person," and that Pinder "was that third person." Id. Counsel allegedly knew that Petitioner and Pinder were subject to a "keep separate order" at the jail and thus could not have had any conversations about the robbery. Doc. 1 at 5. Yet counsel "performed deficiently" by failing to present the "keep separate order" at trial. Id.

The postconviction court rejected this claim on the ground that the "keep separate order" had "no exculpatory or impeachment value." Doc. 14-24 at 369-70. The court noted that Pinder was "taken to the jail" on June 21, 2017—one day after the robbery. Id. at 369. Petitioner was arrested and booked into the jail on June 28, 2017. Id. at 370. On July 5, 2017, a law enforcement officer learned that Petitioner and Pinder "were possibly attempting to intimidate witnesses." Id. at 327. The next day, the officer "went to the jail and completed a keep separate order" for Petitioner and Pinder. Id. As noted above, Pinder allegedly spoke to Petitioner a "couple of weeks" after his June 21, 2017, arrival

at the jail. Doc. 14-6 at 333, 338.

Based on this timeline, the court found that the conversation "could have occurred between June 28, 2017—when [Petitioner] was arrested—and July 6, 2017—when the ['keep separate order'] was entered." Doc. 14-24 at 370. As the court pointed out, the existence of the "keep separate order" did "not lessen the believability of [Petitioner's] jailhouse admission because the two were housed in the jail together for nine days without" such an order. Id. Indeed, the "keep separate order" "confirm[ed] that . . . Pinder and [Petitioner] *definitely* conversed while in the jail in an attempt to intimidate witnesses." Id. According to the court, the "keep separate order" "could not have been effectively used to impeach . . . Pinder's credibility because it would have further corroborated— not refuted—[his] testimony regarding his jailhouse discussions with [Petitioner]." Id. Therefore, "counsel was not deficient" for failing to present the "keep separate order" at trial. Id.

This ruling was reasonable.[4] "The pivotal question is whether the state court's application of the Strickland standard was unreasonable," which is "different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Thus, to prevail on his

---

[4] The First DCA summarily affirmed the denial of postconviction relief. Doc. 14-27; Doc. 14-37. Thus, unless otherwise noted, the Court looks through that decision to the postconviction court's decision. See Wilson, 584 U.S. at 125.

10

ineffective-assistance claim, Petitioner must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020).

Petitioner cannot make this showing. As the postconviction court explained, the "keep separate order" did not refute Pinder's testimony about his jailhouse conversation with Petitioner. Doc. 14-24 at 327. That conversation occurred a "couple of weeks" after Pinder arrived at the jail on June 21, 2017. Doc. 14-6 at 333. Petitioner was booked into the jail on June 28, 2017, and the "keep separate order" was entered on July 6, 2017. Doc. 14-24 at 327, 394. Thus, the conversation could have occurred sometime between June 28 and July 6.[5] Moreover, the postconviction court correctly noted that the "keep separate order" could have hurt the defense by showing that Petitioner and Pinder "conversed while in the jail in an attempt to intimidate witnesses." Id. at 370. In these circumstances, a competent attorney could choose to refrain from informing the jury of the "keep separate order."[6] See Grayson v. Thompson, 257

---

[5] Pinder did not provide a precise date for the conversation. The fourteenth day after Pinder's arrival at the jail was July 5, 2017—one day before the "keep separate order" was entered. Thus, even if a "couple of weeks" meant exactly fourteen days, Petitioner and Pinder could have had the conversation the day before the order was entered.

[6] Petitioner alleges that further investigation would have revealed "jail records" showing that "even prior to" the "keep separate order," he and Pinder were "never housed together." Doc. 1 at 7. But Petitioner has never presented any such records. Petitioner's unsupported "[s]peculation is insufficient to carry [his] burden . . . as to

11

F.3d 1194, 1216 (11th Cir. 2001) ("[I]n order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take." (emphasis omitted)).

### B. Ground Two—Failure to Present Pinder's Handwritten Note

Petitioner faults trial counsel for failing to show the jury a "handwritten note" that Petitioner allegedly received from Pinder. Doc. 1 at 9. According to Petitioner, the note contained Pinder's "confession . . . as to the actual events of the robbery and his significant role in such." Id. The note also stated that Pinder "was forced to lie in his testimony against" Petitioner. Id. Petitioner does not provide a copy of the alleged note. Nor does he provide any additional information about its contents. For example, he does not explain how (or under what circumstances) Pinder was allegedly "forced" to lie at trial. Id. at 9-11. Regardless, Petitioner argues that counsel was deficient for failing to use the note to "impeach [Pinder's]" testimony. Id. at 9.

The postconviction court rejected this claim, finding that Petitioner "was not prejudiced." Doc. 14-24 at 371. As the court noted, Pinder "admitted his involvement in the robbery" at trial. Id. Thus, the part of the note in which Pinder "admitted his 'significant role' in the robbery" was "entirely consistent with, and cumulative of, his trial testimony." Id. The court acknowledged that,

---

what evidence could have been revealed by further investigation." Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985).

12

according to Petitioner, the note also said that "the State forced . . . Pinder to implicate [Petitioner] in the planning of the robbery." Id. But the court found no prejudice from the failure to confront Pinder with the note because counsel "impeach[d] [him] with his myriad other inconsistent statements." Id. Thus, in the court's view, "the note would have [been] cumulative of the other inconsistent statements used to impeach . . . Pinder's credibility." Id.

This ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." Id. at 687. "Applying AEDPA to Strickland's prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Petitioner]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Mungin v. Sec'y, Fla. Dep't of Corr., 89 F.4th 1308, 1317 (11th Cir. 2024).

Petitioner cannot meet this demanding standard. Pinder testified at trial about his role in the robbery, explaining that he agreed to assist Wilson by

13

opening the door for the delivery driver. Doc. 14-6 at 284. The note allegedly discussed Pinder's "significant role" in the robbery, but Petitioner does not show that this confession differed from the account Pinder gave at trial. Doc. 1 at 10. Thus, as the postconviction court found, the note's discussion of Pinder's role in the robbery was cumulative of his trial testimony. Doc. 14-24 at 371. "A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 n.7 (11th Cir. 2002); see also Tanzi v. Sec'y, Fla. Dep't of Corr., 772 F.3d 644, 660 (11th Cir. 2014) ("[E]vidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." (quoting Holsey v. Warden, 694 F.3d 1230, 1260-61 (11th Cir. 2012))).

Likewise, a fairminded jurist could agree that Petitioner suffered no prejudice from the failure to impeach Pinder with his alleged statement that he "was forced to lie in his testimony." Doc. 1 at 9. Even without the note, counsel vigorously impeached Pinder with his prior inconsistent statements. As noted above, Pinder testified that Petitioner confessed to planning the robbery with Wilson. Doc. 14-6 at 333. But counsel got Pinder to admit that, during his deposition, he made the following statement: "I don't know if [Petitioner] knew

14

about the robbery. I don't know what they [i.e., Petitioner and Wilson] talked about before I got to this house. I can't—I don't know." Id. at 336. Counsel also got Pinder to admit that, in his "sworn statement to the State Attorney's Office," he "never said anything . . . about [Petitioner] knowing about the robbery." Id. at 335. A fairminded jurist could conclude that, "because counsel exposed numerous inconsistencies in [Pinder's statements] and the jury still convicted [Petitioner], there was not a reasonable probability that additional impeachment vis-à-vis the [note] would have changed the jury's verdict." Miller v. Sec'y, Dep't of Corr., No. 21-10077, 2022 WL 3452468, at *3 (11th Cir. Aug. 18, 2022); see also Green v. State, 975 So. 2d 1090, 1104 (Fla. 2008) ("No prejudice resulted from counsel's failure to present cumulative evidence of inconsistent statements.").

Moreover, Petitioner has not presented a copy of the note, nor has he provided an affidavit from Pinder confirming its existence. Even assuming the note existed, Petitioner's description of its contents is vague. According to Petitioner, Pinder stated in the note that he "was forced to lie in his testimony." Doc. 1 at 9. But Petitioner fails to allege critical details: who exactly forced Pinder to lie, how he was forced to lie (for example, via threats or promises), what specific portions of his testimony were allegedly false, and when the note was supposedly drafted. Petitioner cannot obtain habeas relief based on "conclusory allegations unsupported by specifics." Tejada v. Dugger, 941 F.2d

15

1551, 1559 (11th Cir. 1991); see also Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient.").

**C. Ground Three—Failure to Oppose Joint Trial**

Petitioner contends that trial counsel should have objected to the State's request to try him and Wilson jointly. Doc. 1 at 13. Before trial, the State moved for joinder, arguing that the charged offenses "were part of a common scheme or plan" and that the evidence "to be offered in each [case] [was], in large part, the same." Doc. 14-2. The State acknowledged a potential Bruton issue related to statements "made by . . . Wilson." Id. Bruton forbids "the admission of a statement made by a non-testifying defendant which inculpates a co-defendant." United States v. Veltmann, 6 F.3d 1483, 1500 (11th Cir. 1993). Wilson told a detective that (1) Petitioner ordered Chinese food before leaving the house, (2) Pinder pointed a gun at the delivery driver after Wilson opened the door for him, and (3) Petitioner "[came] up from behind the driver" "[p]rior to the shooting." Doc. 14-6 at 546-48.

To avoid any Bruton issue caused by Wilson's statements, the State proposed "empaneling . . . two separate juries"—one for Petitioner, and one for Wilson. Doc. 14-2. Counsel for Petitioner and Wilson consented to this

16

procedure, and the court granted the joinder motion.[7] Doc. 14-3. Voir dire was consolidated, and two juries were selected from a single pool of forty-nine venirepersons. Doc. 14-6 at 16. Wilson's jury was chosen first, after his counsel and the prosecutor exercised their cause challenges and peremptory strikes. Id. at 138-45. The same process was repeated to select Petitioner's jury. Id. at 145-49. Both juries were in the courtroom for opening statements by the State, Petitioner's counsel, and Wilson's counsel. Id. at 182-203. As noted above, Petitioner's jury was removed from the courtroom when the State presented Wilson's out-of-court statements.[8] Id. at 543-49. Finally, each jury heard separate closing arguments specific to each defendant, and deliberations took place in separate rooms. Id. at 483-84.

Petitioner now argues that counsel was deficient for failing to object to the joint trial. Doc. 1 at 13-14. According to Petitioner, the trial violated his constitutional rights because (1) it "allowed for a Bruton violation," (2) the jury heard "inadmissible," "prejudicial testimony," and (3) Petitioner was "deprived of a fair opportunity to pick a preferred jury." Id. at 13-18.

The postconviction court rejected this claim for lack of prejudice. Doc. 14-24 at 371-74. It held that the "record" "conclusively refuted" Petitioner's

---

[7] Petitioner and Wilson were represented by different attorneys. Doc. 14-6 at 4.

[8] Wilson did not testify at trial.

assertion that a <u>Bruton</u> violation occurred. <u>Id.</u> at 372. As the court noted, Petitioner's jury "exited the courtroom when the State presented evidence of . . . Wilson's out-of-court statement[s] against" Petitioner. <u>Id.</u> Thus, "no <u>Bruton</u> error arose because [Petitioner's] jury was appropriately shielded from . . . Wilson's statement[s] implicating [Petitioner]." <u>Id.</u>

Next, the court rejected Petitioner's claim that "the joint trial caused his jury to be exposed to more inculpatory evidence—and more damning arguments—than they would have been had [he] be[en] tried separately from . . . Wilson." <u>Id.</u> at 373. The court explained that, even if the cases had been severed, "the State could and would have elicited the same testimony from the same witnesses who testified before [Petitioner's] jury." <u>Id.</u> at 374. The court acknowledged that both juries were present for opening statements on behalf of the State, Petitioner, and Wilson. <u>Id.</u> But the court pointed out that "counsel for . . . Wilson only mentioned [Petitioner] once [during openings], noting he was 'without a doubt identifiable' in the dashcam video." <u>Id.</u> According to the court, "[t]his singular reference did not undermine [Petitioner's] . . . defense because [he] never challenged his presence at the scene." <u>Id.</u> Additionally, "[d]uring closing arguments for . . . Wilson, [Petitioner's] jury was sequestered." <u>Id.</u> In sum, the court found that "none of the evidence or argument presented by or

pertaining to . . . Wilson detracted from a fair determination of [Petitioner's] guilt." Id.

Lastly, the court found that Petitioner failed to show prejudice from "selecting multiple juries from a single jury pool." Id. at 372-73. As the court noted, Petitioner did not allege that any juror was "actually biased" against him. Id. at 373. Instead, he "quibble[d] with the fact that he 'was left to pick jurors from the remnants left by . . . Wilson after he selected his preferred jurors.'" Id. Thus, Petitioner failed to show that the jury selection process "had any effect on [his] ability to receive a fair trial." Id.

The postconviction court reasonably rejected Petitioner's ineffective-assistance claim. First, the joint trial did not result in a Bruton violation. As noted above, Bruton held that "the confession of a nontestifying codefendant that inculpate[s] another defendant [is] inadmissible at [a] joint trial." United States v. Arias, 984 F.2d 1139, 1142 (11th Cir. 1993). One way to avoid a Bruton issue is to "use separate juries." Gray v. Maryland, 523 U.S. 185, 192 (1998). Under the "multiple jury procedure," courts typically "seat both juries for opening statements and for any evidence or testimony admissible in both trials. Then each jury is excused for evidence that is not admissible in its corresponding trial." Velez v. State, 596 So. 2d 1197, 1199 (Fla. 3d DCA 1992). That procedure was followed here. The only statements that could have violated Bruton came from Wilson's interview with law enforcement. Petitioner's jury

19

was excused from the courtroom when the State presented Wilson's out-of-court statements. Doc. 14-6 at 543-49. Because Petitioner's jury did not hear those statements, no <u>Bruton</u> violation occurred.

Second, the postconviction court correctly found that even if the cases had been severed, there was no "reasonable probability that . . . the outcome . . . would have been different." <u>Reed</u>, 767 F.3d at 1261. At a severed trial, the State would have presented the most important evidence against Petitioner. Specifically, the jury would have seen the dashcam footage showing Petitioner walk up to the delivery driver "with a sock over his face," pull out a gun, and attempt to shoot him twice in the back as Wilson and Pinder robbed him. Doc. 14-6 at 634. The jury also would have heard Pinder's testimony that Petitioner admitted to "plann[ing]" the robbery with Wilson. <u>Id.</u> at 333. This evidence was independently sufficient to convict Petitioner of robbery with a firearm. <u>See</u> Fla. Stat. §§ 812.13(1), (2)(a) (defining offense of robbery with a firearm); <u>State v. Amaro</u>, 436 So. 2d 1056, 1060 (Fla. 2d DCA 1983) (under the law of principals, "a felon is liable for the acts of his co-felons").

It is true that some of the evidence at trial was specific to Wilson. For example, Petitioner's jury learned that Wilson pointed a gun at the delivery driver, told him to "come inside," and said "No, that's not going to do, get inside" when the driver tried to hand over the food. Doc. 14-6 at 236-38. But this evidence would have been admissible at a severed trial to "establish the entire

context of the" robbery. Irving v. State, 627 So. 2d 92, 94 (Fla. 3d DCA 1993). In any event, "compelling prejudice does not exist merely because much of the evidence at trial applies only to a co-defendant." United States v. Francis, 131 F.3d 1452, 1459 (11th Cir. 1997).

Petitioner also complains that, during opening statements, Wilson's counsel said that Petitioner appeared "as clear as day" in the dashcam footage. Doc. 14-6 at 197. But as the postconviction court noted, Petitioner's counsel admitted at trial that he was in the footage. Id. at 709. Instead of disputing Petitioner's presence at the scene, counsel argued that Petitioner—with no advance knowledge of the robbery—came upon his friends scuffling with a stranger and tried to help them by brandishing a gun. Id. at 712-14. At most, counsel argued, Petitioner should be found "guilty of aggravated assault." Id. at 716. Therefore, Petitioner suffered no prejudice when Wilson's counsel argued in opening statements that he appeared in the dashcam footage.

Third, the postconviction court reasonably concluded that Petitioner was not prejudiced by the jury selection process. Petitioner alleges that he "was left to pick jurors from the remnants left by . . . Wilson after he selected his preferred jurors." Doc. 1 at 14. But "[a] defendant has no right to any particular juror or jurors, only a fair and impartial jury." Lambrix v. Dugger, 529 So. 2d 1110, 1112 (Fla. 1988); see also United States v. Cardena, 842 F.3d 959, 973 (7th Cir. 2016) ("There is no legally cognizable right to have any particular juror

21

participate in [a defendant's] case."). Petitioner "has not met his burden to show that [any of the jurors who heard his case] could not be fair or that trial counsel's acceptance of them as jurors otherwise prejudiced the result of the" trial. Guardado v. Sec'y, Fla. Dep't of Corr., 112 F.4th 958, 995 (11th Cir. 2024). Therefore, he fails to show "a substantial likelihood that, absent any [alleged] error by trial counsel in failing to challenge [the jury selection process]," the outcome at trial would have been different.[9] Id.

### D. Ground Four—Failure to Make Plea Offer to State

Petitioner contends that trial counsel was ineffective for failing to initiate plea negotiations with the State. Doc. 1 at 21. According to Petitioner, he asked counsel to "convey a reasonable plea offer of" ten to fifteen years' imprisonment. Id. Yet counsel refused, allegedly "depriv[ing]" Petitioner of "the opportunity to negotiate a favorable plea [with] the State for a less harsh sentence" than the fifty years he received after trial. Id. Petitioner alleges that had counsel tried to negotiate a ten-to-fifteen-year plea deal, there "is a reasonable probability that

---

[9] The Florida Supreme Court has found that "[t]he consolidated jury selection procedure" can be "a valid exercise of [a] trial court's discretion in promoting jury management and efficiency." Rock v. State, 638 So. 2d 933, 934 (Fla. 1994); see also United States v. Quesada-Bonilla, 952 F.2d 597, 599 (1st Cir. 1991) ("We are aware of no authority that prohibits a court, as a general matter, from empaneling juries for several cases in a single proceeding . . . .").

22

he would have reached an agreement with the State without being forced to go through an unfavorable trial." Id.

The postconviction court held that Petitioner "was not prejudiced" by counsel's failure to make an offer of ten to fifteen years' imprisonment. Doc. 14-24 at 375. To show prejudice in this context, Petitioner needed to establish a reasonable probability that "the trial court would have accepted the offer." Id. at 374. And the "record conclusively establishe[d]" that the trial court would not have "accepted [Petitioner's] unreasonably low plea offer." Id. at 375. As the postconviction court pointed out, Petitioner "faced a maximum sentence of life imprisonment." Id. At sentencing, "the State argued" that this was "one of the most aggravated armed robberies" and "recommended . . . a forty-year term of imprisonment." Id. Despite that recommendation, the trial court "sentenced [Petitioner] to fifty years in prison." Id. According to the postconviction court, "[t]his departure show[ed] that [the trial court] would have been . . . indisposed to accepting [Petitioner's] ten-to-fifteen-year plea offer." Id. Thus, the record "establishe[d] that the offer would have never been approved" by the trial court.[10] Id.

This ruling was reasonable. "Where a petitioner raises an ineffective assistance claim asserting that his counsel was deficient in plea discussions, to

---

[10] The sentencing and the postconviction proceedings were presided over by different judges. Doc. 14-10 at 1; Doc. 14-24 at 379.

23

demonstrate prejudice he must show that, but for the ineffective assistance of counsel, a reasonable probability existed that: (1) the plea offer would have been presented to the court (i.e. the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its terms; and (3) under the offer's terms, the conviction or sentence, or both, would have been less severe than under the judgment and sentence that were, in fact, imposed." Carmichael v. United States, 966 F.3d 1250, 1259 (11th Cir. 2020).

A fairminded jurist could find no "reasonable probability" that the trial court "would have accepted" a ten-to-fifteen-year plea deal in this case. Id. A Florida court "is never bound in sentencing by the negotiations which occur between the prosecuting attorney and the defense counsel." Davis v. State, 308 So. 2d 27, 29 (Fla. 1975). Here, the sentencing transcript shows that the court would have been "indisposed to accepting [Petitioner's] ten-to-fifteen-year plea offer." Doc. 14-24 at 375. The court stated that "this [was] an aggravated armed robbery"—indeed, it was "as bad of an armed robbery as you could imagine." Doc. 14-10 at 18-19. The court gave the following description of Petitioner's role in the robbery: "[Petitioner] comes around, pulls a gun out of his pocket, racks the gun and attempts to shoot the man. . . . He fires the gun twice, it doesn't go off, thank God, because otherwise we would be here on a murder charge." Id. The court then said that it had initially planned to "give [Wilson] life in prison

24

because that's exactly what this case deserves." <u>Id.</u> at 20. But it ended up imposing a fifty-year sentence on Wilson because "the State only asked for fifty years." <u>Id.</u> The court did not "see the difference between [Petitioner] and . . . Wilson." <u>Id.</u> Thus, despite the State's recommendation of a forty-year sentence for Petitioner, the court sentenced him to fifty years' imprisonment. <u>Id.</u> at 16, 21.

After pronouncing sentence, the court said, "You and guys like you, Mr. Fudge, are the things that do make me lay awake at night sometimes. Usually I could go home and go to sleep[;] this kind of thing bothers me. And there's other things that bother me, but I'm looking at you, Dear God, man, but I can't have you out running around. Who could trust you? Nobody. I just don't get it." <u>Id.</u> at 21.

These remarks—along with the court's decision to impose a fifty-year sentence despite the State's forty-year recommendation—strongly suggest that the court would not have accepted a ten-to-fifteen-year plea deal. Therefore, a fairminded jurist could conclude that Petitioner suffered no prejudice from counsel's failure to make the proposed offer. <u>See</u> <u>Lawson v. Sec'y, Dep't of Corr.</u>, 785 F. App'x 722, 726 (11th Cir. 2019) (rejecting ineffective-assistance claim because—in light of the "nature of [the] crime" and other factors—petitioner failed to "establish that the trial court would have accepted an agreement recommending that he receive a sentence of 25 years of imprisonment or less");

25

Bethea v. Sec'y, Dep't of Corr., No. 16-14689-E, 2016 WL 11859834, at *3 (11th Cir. Nov. 3, 2016) (no Strickland prejudice where petitioner "ha[d] not shown that the trial court would have accepted" a "12-year plea deal"); Arocho v. Sec'y, DOC, No. 2:16-cv-910-SPC-MRM, 2019 WL 2503144, at *7 (M.D. Fla. June 17, 2019) (finding it "improbable that [the trial court] would have accepted the State's offer of seven years" in light of petitioner's "crimes" and the court's "statements at the sentencing").

**E. Ground Five—Advising Petitioner Not to Testify**

Petitioner argues that trial counsel "was ineffective for advising him" not to testify at trial. Doc. 1 at 24. According to Petitioner, he told counsel he wanted to testify that "he did not help plan the robbery, was not part of it[,] and was withdrawn from the operation." Id. at 25. Petitioner also would have explained to the jury that he pulled out his gun because he "was confronted with what appeared to be an altercation between [the delivery driver] and his co-defendants." Id. at 26. Counsel allegedly "advised Petitioner that he should not testify because his testimony would support a guilty finding." Id. at 25. In Petitioner's view, this "misadvice" deprived him of the opportunity to establish "his innocence of the robbery." Id. at 25-26.

The postconviction court held that the record "conclusively refute[d] that [Petitioner] was prejudiced by not testifying at trial." Doc. 14-24 at 376. As the court explained, the delivery driver's "dashcam recorded [Petitioner]

26

approaching the [driver] from behind and training his firearm at the [driver] ([Petitioner] was readily identifiable from this recording)." Id. Pinder, the co-defendant who testified for the State, offered a "version of events [that] mirrored what was captured in the dashcam recording." Id. Indeed, Pinder "named [Petitioner] as the perpetrator who approached the [driver] from behind." Id. "Taken together," the court found, "this evidence provide[d] proof of [Petitioner's] guilt beyond any reasonable doubt." Id.

The court then considered Petitioner's defense that he was unaware of the robbery. Id. It called this theory "preposterously far-fetched." Id. As the court noted, Petitioner's argument was that "Pinder and Wilson independently planned the robbery (mere minutes after [Petitioner] left them in the vacant home) and that [Petitioner] was completely unaware of this half-cocked scheme." Id. According to the court, Petitioner's "purported ignorance [was] entirely unbelievable given that he approached the [driver] from behind with his gun drawn simultaneously to his confederates robbing the [driver] at gunpoint from within the house." Id. at 376-77. The court thus concluded that "even if [Petitioner] chose to testify, no reasonable jury could find any credence in [his] outlandish post hoc explanation." Id.

The rejection of this claim was reasonable. Petitioner cannot show that the postconviction court's finding of no prejudice "was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Mungin, 89

27

F.4th at 1317. As the court explained, the prosecution presented "substantial evidence" of Petitioner's guilt. Fugate v. Head, 261 F.3d 1206, 1224 (11th Cir. 2001); see also McCoy v. Newsome, 953 F.2d 1252, 1262 (11th Cir. 1992) ("[T]he other substantial evidence of [petitioner's] guilt negates any possibility of prejudice resulting from his attorney's [alleged deficiencies]."). Most important, the dashcam footage showed Petitioner walk up to the delivery driver "with a sock over his face," pull out a gun, and attempt to shoot him twice in the back as Wilson and Pinder robbed him. Doc. 14-6 at 634. Additionally, Pinder testified that Petitioner admitted to "plann[ing]" the robbery with Wilson. Id. at 333. Given the strength of the prosecution's case, a fairminded jurist could agree that Petitioner suffered no prejudice from not testifying at trial. See Bates v. Sec'y, Fla. Dep't of Corr., 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show Strickland prejudice.").

And even without his testimony, Petitioner was able to argue to the jury that he was unaware of the robbery and merely sought to protect his friends. As explained above, counsel did not deny that Petitioner appeared in the dashcam footage. Instead, counsel argued that Petitioner—with no advance knowledge of the robbery—saw his friends scuffling with a stranger and tried to assist by pulling out his gun. Doc. 14-6 at 712-14. Counsel also addressed Pinder's testimony, arguing that he lacked credibility because he had previously

28

denied that Petitioner knew about the robbery. Id. at 704-05. Counsel thus asked the jury to "render a verdict of not guilty on armed robbery, attempted armed robbery, but a verdict of guilty of aggravated assault." Id. at 716. Because Petitioner's "proposed testimony mirrored his attorney's closing argument to the jury," a fairminded jurist could conclude that "the outcome of his trial would not have been different" had he "testified as proposed." Isom v. Sec'y, Fla. Dep't of Corr., 569 F. App'x 660, 665 (11th Cir. 2014).

**F. Ground Six—Failure to Request Independent-Act Instruction**

Petitioner faults trial counsel for failing to request an "independent act" jury instruction. Doc. 1 at 28. The independent-act doctrine applies "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, which fall outside of, and are foreign to, the common design of the original collaboration." Ray v. State, 755 So. 2d 604, 609 (Fla. 2000). "Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act." Id. "The independent-act theory allows, under narrow circumstances, a limit to [the] broad scope of culpability" created by the law of principals.[11] Roberts v. State, 4 So. 3d 1261, 1265 (Fla. 5th

---

[11] "To be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime." Watkins v. State, 826 So. 2d 471, 474 (Fla. 1st DCA

DCA). But the independent-act doctrine does not apply when there "was no common plan between [the defendant and his co-defendants]." Boyd v. State, 912 So. 2d 26, 27 (Fla. 4th DCA 2005).

Petitioner contends that an independent-act instruction was needed to prove his defense that he "did not commit the robbery, nor did he aid or abet the commission of the robbery in any way." Doc. 1 at 28. According to Petitioner, the robbery was "the result of the independent actions of" Wilson and Pinder. Id. In this version of events, Petitioner's "sudden appearance at the scene of the robbery was purely coincidental," and he "brandish[ed] a gun" at the delivery driver in "react[ion] to . . . an altercation in which his friends were in danger." Id. at 28-29. Thus, Petitioner contends, the failure to request an independent-act instruction "deprived [him] of his sole theory of defense." Id. at 29.

The postconviction court rejected this claim, finding neither deficient performance nor prejudice. Doc. 14-24 at 377. The court noted that the independent-act doctrine "is not appropriate where the defendant denies involvement in" any common plan. Id. Petitioner argued at trial that "he was *not* a part of any plan with his co-defendants, rendering an independent-act instruction inappropriate." Id. Thus, according to the court, "counsel was not deficient for failing to request a meritless[] independent-act jury instruction."

---

2002). Petitioner's jury received the standard instruction on principal liability. Doc. 14-6 at 731.

Id. The court separately concluded that Petitioner suffered no prejudice because his independent-act defense was "so thoroughly contrary to common sense as to be inherently incredible." Id. (citation omitted).

This ruling was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, Petitioner was not entitled to an independent-act instruction. Doc. 14-24 at 377. Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Petitioner] argues he should have done." Herring v. Sec'y Dep't of Corr., 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. See Sabillo v. Sec'y, Dep't of Corr., 355 F. App'x 346, 349 (11th Cir. 2009) ("The state courts concluded that [petitioner] was not entitled to an instruction about third degree murder based on the evidence at trial, and we defer to that conclusion."); Coldiron v. Jones, No. 3:14-cv-181-LC-CJK, 2016 WL 7031973, at *22 (N.D. Fla. Aug. 30, 2016) ("The state courts concluded, as a matter of state law, that petitioner was not entitled to an instruction about independent act based on Florida precedent, and this court

31

defers to that conclusion."), adopted by 2016 WL 7031292 (N.D. Fla. Nov. 30, 2016).[12]

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that Petitioner was not entitled to an independent-act instruction, the remainder of the analysis is straightforward. Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." Freeman v. Atty. Gen., 536 F.3d 1225, 1233 (11th Cir. 2008). Therefore, the postconviction court reasonably concluded that counsel was not ineffective for failing to request an independent-act instruction.

Moreover, a fairminded jurist could agree that even if Petitioner had received the instruction, there was no reasonable probability of an acquittal. As explained above, the prosecution presented overwhelming evidence of

---

[12] See also Young v. Florida, No. 20-cv-61074-RAR, 2022 WL 2834668, at *9 (S.D. Fla. July 20, 2022) (rejecting ineffective-assistance claim because "[t]he state court concluded that the independent-act doctrine did not apply under state law, and this Court cannot second-guess that dispositive legal conclusion"), aff'd, No. 22-13319, 2024 WL 3964936 (11th Cir. Aug. 28, 2024); Milton v. Inch, No. 4:18-cv-581-RH-MJF, 2020 WL 3230278, at *12 (N.D. Fla. May 20, 2020) ("This court . . . defers to the state court's state-law conclusion that [petitioner] did not qualify for an instruction on Florida's independent-act defense."), adopted by 2020 WL 3213377 (N.D. Fla. June 12, 2020); Melton v. McDonough, No. 3:06-cv-545-MCR-EMT, 2007 WL 2904133, at *15 (N.D. Fla. Oct. 4, 2007) ("This court must accord deference to the state court's decision to the extent it decides the validity of Petitioner's underlying state law claim, that is, whether he was entitled to an 'independent act' instruction, while reserving for federal habeas review the ultimate issue of whether the state court's decision on the ineffective assistance of counsel claim was unreasonable.").

32

Petitioner's guilt. Given the strength of the prosecution's case, no reasonable probability exists that the outcome at trial would have been different had the jury received an independent-act instruction. See Bates, 768 F.3d at 1300 n.9 ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show Strickland prejudice.").

### G. Ground Seven—Failure to Object to "Impermissible Identification"

Petitioner argues that trial counsel should have objected when Detective Joseph Bruce testified that Petitioner was visible in the delivery driver's dashcam footage. Doc. 1 at 33. The prosecutor asked Detective Bruce, "Through your investigative resources, were you able to identify a third suspect in this case?" Doc. 14-6 at 523-24. Detective Bruce said, "Yes," and explained that he had identified Petitioner as the "third suspect" "through the video." Id. at 524. According to Petitioner, counsel was deficient for not objecting to this "improper identification of Petitioner by Detective Bruce from a video recording." Doc. 1 at 33. Petitioner argues that Detective Bruce "had no prior basis of knowledge to identify [him], and was in no better position than the jury to make such identification." Id. He also contends that the identification "implied that he was already known by police for being involved in prior criminal activity." Id. at 34.

The postconviction court rejected this claim, finding that Petitioner "was not prejudiced." Doc. 14-24 at 378. As the court pointed out, "the theory of

defense was not misidentification; indeed, [Petitioner] conceded he was the person shown in the dashcam video." Id. Moreover, co-defendant Pinder "identified [Petitioner] as the person who came up behind, and pointed a gun toward, the [delivery driver]." Id. In light of "this evidence and concession," the court found "no reasonable likelihood the outcome of the proceedings would have been different had Detective . . . Bruce not identified [Petitioner] based on the dashcam footage." Id.

The postconviction court correctly rejected this claim for lack of prejudice. As noted above, Petitioner conceded at trial that he appeared in the dashcam footage. Specifically, in closing argument, defense counsel agreed that the footage showed Petitioner "come[] around the front" of the house and point a gun at the delivery driver. Doc. 14-6 at 709, 712-14. Given that concession, there is no "reasonable probability that . . . the outcome . . . would have been different" had Detective Bruce not identified Petitioner. Reed, 767 F.3d at 1261. Moreover, contrary to Petitioner's assertion, nothing about the identification "implied that he was already known by police for being involved in prior criminal activity." Doc. 1 at 34. Detective Bruce never suggested that Petitioner had engaged in "prior criminal activity." Id. Instead, he said that through his "investigative resources"—in particular, the dashcam footage—he had identified Petitioner as a suspect in the robbery. Doc. 14-6 at 523-24. Petitioner speculates that, as a result of this testimony, the jury was "led . . . to believe that [he] had previous

34

run-ins with the law." Doc. 1 at 35. But Petitioner's unsupported "speculation is insufficient to carry [his] burden" on federal habeas review. Johnson v. Alabama, 256 F.3d 1156, 1187 (11th Cir. 2001).

## H. Ground Eight—Failure to Object to Principal Instruction

According to Petitioner, appellate counsel should have argued on direct appeal that trial counsel was ineffective for failing to object to the jury instruction on principal liability. Doc. 1 at 37-39. As noted above, the jury received the standard instruction on the law of principals: "If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he or she had done all the things the other person or persons did if the defendant had a . . . conscious intent that the criminal act be done and the defendant did some act or said some word . . . which was intended and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit the crime." Doc. 14-6 at 731.

Petitioner contends that the jury should not have received the principal instruction because (1) the information did not "charge [him] as a principal" and (2) the evidence at trial "did not support the instruction." Doc. 1 at 39. Even under de novo review, this claim fails because counsel had no basis to raise Petitioner's meritless objections. See United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for failing to raise claims reasonably considered to be without merit.").

35

It is true that the charging information does not allege that Petitioner was a principal to the robbery. Doc. 14-1. But "a defendant need not be charged as a principal to support a conviction as a principal." Ford v. State, 306 So. 3d 417, 422 (Fla. 1st DCA 2020); see also United States v. Martin, 747 F.2d 1404, 1407 (11th Cir. 1984) ("Aiding and abetting need not be specifically alleged in the indictment . . . ."); United States v. Tucker, 402 F. App'x 499, 502 (11th Cir. 2010) ("The district court did not err, plainly or otherwise, when it gave an aiding-and-abetting instruction to the jury, although such a theory of guilt was not alleged in the indictment."). Because the information did not need to allege principal liability, counsel was not deficient for failing to raise this objection.

Nor was counsel obligated to raise Petitioner's meritless argument that the evidence did not support the principal instruction. "In order to convict a defendant as a principal, the State must prove that (1) the defendant intended for the offense to be committed and that (2) the defendant assisted in the commission of the offense." McBride v. State, 7 So. 3d 1146, 1148 (Fla. 2d DCA 2009). Here, the State proved both elements. As noted above, Pinder testified that Petitioner confessed to planning the robbery with Wilson. Doc. 14-6 at 333. That is sufficient to establish that Petitioner "intended for the offense to be committed." McBride, 7 So. 3d at 1148. Additionally, dashcam footage showed Petitioner walk up to the delivery driver "with a sock over his face," pull out a gun, and attempt to shoot him twice in the back as Wilson and Pinder robbed

36

him. Doc. 14-6 at 634. This footage proves that Petitioner "assisted in the commission of the offense."[13] McBride, 7 So. 3d at 1148.

### I. Ground Nine—Alleged Illegality of Fifty-Year Sentence

Lastly, Petitioner argues that his fifty-year prison sentence is unlawful because (1) the trial court relied on "an improperly calculated scoresheet," (2) the sentence "exceeds the maximum permitted by law," and (3) the sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Doc. 10 at 2.

As an initial matter, any alleged scoresheet error is not cognizable on federal habeas review. "[S]tate courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters." Herring, 397 F.3d at 1355. Thus, "a habeas petition grounded on issues of state law provides no basis for habeas relief." Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988). "In the area of state sentencing guidelines in particular, [the Eleventh Circuit] consistently ha[s] held that federal courts cannot review a state's alleged failure to adhere to its own sentencing procedures." Id. (collecting cases). Therefore, "to the extent that Petitioner claims his sentence was

---

[13] Petitioner appears to allege that "no robbery" occurred because "there was no taking" of property. Doc. 1 at 39. But as the postconviction court explained, Pinder "testified he somehow ended up with the Chinese food that was delivered by the [driver] in his hands." Doc. 14-24 at 378. That was "a taking sufficient to establish robbery," and Petitioner was properly held responsible for it as a principal. Id.

improperly calculated because it was based on a scoresheet error, his claim is not cognizable in this federal habeas proceeding." Doughty v. Florida, No. 19-cv-80705, 2021 WL 1601732, at *7 (S.D. Fla. Jan. 26, 2021), adopted by 2021 WL 1601199 (S.D. Fla. Apr. 23, 2021).

Cognizability aside, the postconviction court reasonably rejected Petitioner's claim. Doc. 14-33 at 12-13. According to Petitioner, the scoresheet was "improperly calculated" because the trial court erroneously assumed that the "maximum sentence" for robbery with a firearm was "life [imprisonment]." Doc. 14-33 at 6. Petitioner is mistaken. In fact, "robbery with a firearm" carries "a maximum sentence of life imprisonment." Dotel v. State, 175 So. 3d 830, 832 (Fla. 4th DCA 2015); see also Grosvenor v. State, 308 So. 3d 665, 667 n.2 (Fla. 5th DCA 2020) ("Robbery is a second-degree felony. However, '[i]f in the course of committing the robbery the offender carried a firearm or other deadly weapon, then the robbery is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment.'" (citations omitted)). Thus, no scoresheet error occurred, and Petitioner's fifty-year sentence does not exceed the statutory maximum. See Grosvenor, 308 So. 3d at 667 n.2 ("[Defendant's] fifty-year sentence for the robbery with a firearm conviction is a legal sentence.").

As for Petitioner's Eighth Amendment challenge, the postconviction court reasonably concluded that it lacked merit. Doc. 14-33 at 12-13. "The Eighth

38

Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences." Ewing v. California, 538 U.S. 11, 20 (2003). "[F]ederal courts should be reluctant to review legislatively mandated terms of imprisonment, and . . . successful challenges to the proportionality of particular sentences should be exceedingly rare." Id. at 22. "[A] reviewing court must make a threshold determination that the sentence imposed is grossly disproportionate to the offense committed and, if it is grossly disproportionate, the court must then consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions." United States v. Moriarty, 429 F.3d 1012, 1024 (11th Cir. 2005). "In general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment." Id.

As explained above, Petitioner faced a statutory maximum of life imprisonment for robbery with a firearm. Dotel, 175 So. 3d at 832. His fifty-year sentence—imposed when he was twenty years old—falls "within the limits [set] by statute," which weighs against finding that it violates the Eighth Amendment. United States v. Flores, 572 F.3d 1254, 1268 (11th Cir. 2009). Additionally, a fairminded jurist could conclude that the fifty-year sentence is not "grossly disproportionate to the offense committed." Moriarty, 429 F.3d at 1024. The Supreme Court has "set a high bar for a sentence to be 'grossly

39

disproportionate,'" holding in one case that "a sentence of life without parole was not grossly disproportionate for a first-time offender convicted of cocaine possession." United States v. Bowers, 811 F.3d 412, 432 (11th Cir. 2016) (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)). Given this precedent, a fairminded jurist could agree that a fifty-year sentence for robbery with a firearm does not violate the Eighth Amendment. See Elozar v. McDonough, No. 6:06-cv-1821-GAP-DAB, 2007 WL 4365595, at *3 (M.D. Fla. Dec. 12, 2007) ("[T]his Court cannot conclude that a life sentence with a ten-year minimum mandatory term of imprisonment for robbery with a firearm is a grossly disproportionate sentence to the offense.").

Indeed, as the trial court pointed out during sentencing, "this [was] an aggravated armed robbery." Doc. 14-10 at 18. Petitioner and his co-defendants lured a delivery driver to an abandoned house and robbed him at gunpoint. Id. One of the co-defendants exchanged gunfire with the driver, who managed to escape unharmed. Id. at 19. Although he was not inside the house when the robbery took place, Petitioner nonetheless played a significant role in the offense. As the court put it: "[Petitioner] comes around [to the front of the house], pulls a gun out of his pocket, racks the gun and attempts to shoot the man. . . . He fires the gun twice, it doesn't go off . . . ." Id. at 18. Given the calculated nature of the robbery and Petitioner's willingness to use lethal force to carry it out, a fairminded jurist could find that his fifty-year sentence is not

40

"grossly disproportionate to the offense committed." Moriarty, 429 F.3d at 1024; see also Enmund v. Florida, 458 U.S. 782, 797 (1982) ("[R]obbery is a serious crime deserving serious punishment.").

Accordingly, it is

**ORDERED**:

1.     The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[14]

3.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of June,

---

[14] The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

41

2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

TpaP-2
c:
Dominique J. Fudge, #J61534
Counsel of Record

42